Booth, Chief Justice,
delivered the opinion of the court:
Andrea Sanguineti fu Giuseppe was all his life a citizen and resident of Italy. Prior to and during all the period of this claim up to the date of his death in 1929 he owned and operated the sailing vessel known as the Jolcunda. During the year 1918 the J olanda was under requisition to the Italian Government and directed to transport coal from the United States to the Italian coaling station located at Dakar, on the West Coast of Africa.
The owner of the vessel under the terms of the requisition was permitted to transport cargoes on her west-bound voyage to the United States on his own account, subject only to account for and pay over to the Italian Government 20 percent of the gross amount of freight charges received by him upon any such voyage.
May 19, 1918, the owner entered into a charter party with V. Q. Peterson, a citizen of Denmark, to transport on the J olanda a cargo of cocoa beans from Accra, Gold Coast, West Africa, to New York. The charterer Peterson was to pay freight at the rate of £15 per English ton of cargo transported and so far as herein pertinent was to pay the expense *9 incident to the discharge of the cargo at the point of destination, the vessel expressly reserving a lien upon the same until freight payments were completed.
The charter party also contained the following provisions essential to quote:
In case the American Shipping Board may impose any restrictions of chartering price and that these restrictions may be applicable to this contract, same will be valid just the same, but the decrease of price required will produce these consequences:
If the same means a decrease in freight of more than 5 pounds per ton, the laydays will apply to 200 tons per day, and the demurrage to 175 lbs. per day.
If the same means a decrease in freight to one-half or less, the laydays will apply to 300 tons per day and the demurrage to 250 lbs. per day.
In this case the reductions or restrictions to be made will take place at the port of destination in North America.
Peterson subchartered the J olanda to F. W. and W. Swanzy, of London, realizing a gain of £5 per ton of cargo transported.
The J olanda sailed from the Gold Coast on August 13, 1918, and arrived at New York on October 30, 1918. On her arrival an unpaid freight charge amounting to $87,-917.20 was due from the charterer to the owner, and this case involves the right of the plaintiffs to recover this sum from the United States under the facts of the case as found by the court.
The act of July 18, 1918 (40 Stat. 913), apropos this controversy, was a comprehensive war measure granting to the President plenary authority with respect to chartering of American vessels owned by citizens of the United States. This act forms the foundation upon which the case rests, and some of its provisions must be quoted:
Sec. 5. That the President may, by proclamation, require that vessels of the United States of any specified class or description, or in any specified trade or trades, shall not be chartered unless the instrument in which such charter is embodied, and the rates, terms, and conditions thereof are first approved by him. Whenever any vessel is comprised in any such proclamation, it shall be *10 unlawful to make any charter thereof, or comply with or perform any of the rates, terms, or conditions of any charter thereof, or to operate such vessel under any charter, without first obtaining the approval thereof by the President.
Whenever any charter of such vessel is approved, it shall be unlawful, without the approval of the President first obtained, to make any alterations in such charter, or additions thereto or deletions therefrom, or to make or receive any payment or do any act with respect to such vessel, except in accordance with such charter.
Sec. 6. That the President shall have power to determine, prescribe, and enforce reasonable freight rates and the terms and conditions of affreightment which shall govern the transportation of goods on vessels of the United States, which shall be filed with the United States Shipping Board and open to public inspection. It shall be unlawful to charge or collect any compensation for the transportation of goods on any such vessel, or to enforce or attempt to enforce any terms or conditions of affreightment, or to make or receive any payment or do any act with respect to such transportation, not in accordance with the rates, terms, and conditions so prescribed, anything in any contract, whether heretofore or hereafter made, to the contrary notwithstanding.
Seo. T. That the President shall have power to prescribe the order of priority in which goods shall be carried or other services performed by any vessel of the United States and to specify goods which shall be carried or to direct the voyage or employment of any such vessel and to make such rules, regulations, and orders, with respect to any such vessel, relating to the loading, discharging, lighterage, or storage of goods, or the procurement of bunker fuel, or any other matter relating to the receiving, handling, transporting, storing, or delivering of goods, as may in his judgment be necessary and proper for the efficient utilization of transportation facilities and the effective conduct of the war.
Beg. 8. That the President may by proclamation extend the provisions of sections five, six, and seven, or any of them, to any vessel of foreign nationality under charter to a citizen of the United States or other person subject to the jurisdiction thereof.
Sec. 10. That the President may by proclamation require that no citizen of the United States, or other person subject to the jurisdiction thereof, shall charter any vessel of foreign nationality unless the instrument *11 in which such charter is embodied and the rates, terms, and conditions thereof are first approved by the President. After the making of such proclamation it shall be unlawful for any such citizen or person to make any charter of any such vessel, or comply with or perform any of the rates, terms, or conditions of any charter thereof, or to operate any such vessel under any charter, without first obtaining the approval thereof by the President.
Seo. 16. That whoever does or attempts to do anything in this Act declared to be unlawful, or willfully violates any rule, regulation, or order issued under authority conferred herein, shall be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both: Provided, That the district court of the Canal Zone shall have jurisdiction of offenses committed against the provisions of this Act within the Canal Zone.
On July 29,1918, the President issued the following proclamation :
Now, therefore, I, Woodrow Wilson, President of the United States of America, acting under authority conferred in Section 5 of said Act, do proclaim that hereafter vessels of the United States, being full power driven vessels of 250 tons gross burden, or over, or sailing vessels with or without auxiliary power of 50 tons gross burden, or over, excepting vessels plying exclusively on the inland rivers and canals of the United States, vessels operating in the Great Lakes or other inland waters, and vessels operating exclusively in the coastwise trade of the United States, shall not liereafter be chartered unless the instrument in which such charter is embodied, and the rates, terms, and conditions thereof, are first approved by the President.
Under authority conferred in Section 8 of said Act, I do further proclaim that the provisions of said Section 5, and of this Proclamation, shall be and they are hereby extended to any vessel of foreign nationality under charter to a citizen of the United States or other person subject to the jurisdiction thereof.
Under authority conferred, in Section 10 of said Act, I do further proclaim that hereafter no citizen of the United States or other person subject to the jurisdiction thereof, shall charter any vessel of foreign nationality unless the instrument in which ’such charter is embodied *12 and the rates, terms, and conditions thereof are first approved by the President.
I do hereby designate the United States Shipping Board as the agency through which shall be exercised all power and authority conferred upon the President in Sections 5, 8, and 10 of said Act with respect to the classes or descriptions of vessels and the trades specified in this Proclamation. Such power and authority may be exercised by said United States Shipping Board through such agents or agencies as it may create or designate.
Nothing contained in this Proclamation shall be deemed to withdraw from the United States Shipping Board or the War Trade Board any authority now exercised, directly or indirectly, over foreign or American vessels, by virtue of powers conferred under Title VII of an Act entitled “An Act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes”, approved June 15, 1917.
It is conceded that, in accord with the legislation and proclamation of the President quoted, a chartering committee was on August 7,1918, designated by the Shipping Board and authorized to exercise the authority delegated to the Board by. the President, and without going further into detail with respect to the governmental authority and regulations of the chartering committee it is sufficient to state that for the type of vessel similar to the Jolanda a freight rate of $22 per ton was established.
The Jolanda arrived in New York without an import license and without the approval of the chartering committee to its charter party with Peterson. The Italian Ministry of Shipping at New York had informed the chartering committee of the terms of .the charter party and sought its approval. The chartering committee did not officially disapprove the charter party. The chartering committee took the position that it could not. approve a freight rate in excess of the one fixed by it, and stated that the matter would be taken up with the authorities at Washington, and nothing further could be done until the Jolcmda arrived at New *13 York, when it would “endeavor to straighten out the matter, together with the Food Administration and the War Trade Board.”
When the Jolanda arrived at New York the owner could not discharge cargo for three obvious reasons: He had not received the balance due him as freight charges; he possessed no import license, and the charter party with Peterson, as well as Peterson’s assignee, had not been approved. So, manifestly, he was not allowed to do more than await developments. Of course, the owner of the vessel could have disregarded all the obstacles to a discharge of her cargo and sailed to a neutral port and by sale of the same realized the balance due him as freight.
To do this, however, he would have prejudiced the interest of his own and the United States Government, allies in war, by losing for the time being at least the services of a vessel then badly needed by both Governments. Therefore, all parties interested entered into an oral agreement, by the terms of which the chartering committee consented to approve the charter party, grant the owner a license to land and discharge cargo, whereupon Lykes Brothers, representing the charterer, were to pay to the Italian Ministry of Shipping the $81,917.20 due as freight charges, the latter to deposit the same with the chartering committee, there to remain and await its proper and lawful disposition.
This agreement was carried out. The chartering committee delivered the check for $87,917.20 to the Shipping Board at Washington and the Board deposited it with the Treasurer of the United States, by whom it was cashed and the Shipping Board’s account credited with the same (Finding 12). Prolonged and repeated efforts have been made by the plaintiffs and their predecessor in title to recover the above deposit. The record does not disclose any claim upon the part of the United States to the money, but does disclose a voluminous correspondence with respect to a settlement of the controversy and a refusal to refund the same.
The defendant interposes a number of defenses. We think it important to discuss only two of them. These two are embodied in the following statement taken from de *14 fendant’s brief: “The Chartering Committee did not and could not make a contract for a return of the money exacted for permission to discharge the cargo transported on the Jolanda and as a penalty for violating United States laws and regulations. Where the power to make an express contract is wanting, no implied contract can arise.”
This contention in its broadest aspect challenges the authority of the chartering committee to make any contract involving the return of money exacted by the same. It is manifestly predicated upon an assumption that the committee possessed lawful authority to fix the freight rates applicable to the charter party involved, and could exact a penalty from anyone seeking to or violating any order or regulation of the committee.
The defense is. vulnerable. In the first place, the owner of the Jolanda was a citizen of Italy. The vessel was rrnder requisition to the Kingdom of Italy and flew the Italian flag. The charterer was a citizen of Denmark and therefore neither the vessel nor the parties interested were subject to the jurisdiction of the United States except as hereafter stated. The chartering committee did not possess the authority to fix the terms of the charter party now under consideration. Its authority, however, did extend to the right of granting an import license to the owner of the vessel, and by refusing to approve any charter party, either foreign or domestic, and grant a license to discharge cargo the Committee could effectually prevent the Jolanda from landing at any port of the United States and dispose of her cargo.
The situation which confronted the owner of the vessel, the charterer, the Italian Ministry of Shipping, and the chartering committee, an agency of the United States, was one which in and of itself not only suggested the contract which was made but was the one and only solution of an unanticipated difficulty fraught with serious consequences to all parties concerned if not immediately adjusted and settled. The, chartering committee did not want to unduly detain the vessel in port and thereby delay Italy’s shipment *15 of needed coal. The owner was anxious to- collect his freight and the charterer was equally anxious if he could to escape payment of what was due the owner. The war situation was critical and the parties in good faith acted wisely.
Was then what was done by the chartering committee within the scope of its lawful authority? The comprehensive authority conferred upon the committee in pursuance. of the act of July 18-, 1918, supra, did not limit its actions to inflexible rules and regulations, nor render its approvals or disapprovals of charter parties, as well as fixing charter party rates of freight, irrevocable. The committee undoubtedly possessed a latitude of authority to meet emergency situations and to act accordingly. We need not cite familiar cases to sustain this statement. If it were otherwise, the intent and purpose of the act of July 18, 1918, would have been unattainable.
The facts of this case indisputably attest the scope and intent of the agreement the parties entered into. The chartering committee was somewhat in doubt as to whether a charter party calling for a freight rate in excess of that prescribed therein should or could be approved. This doubt arose because of the citizenship of the parties and the nationality of the vessel, and therefore, as to its jurisdiction over the transaction, the doubt was to be referred to higher authority and in order to escape the delay incident to its solution the agreement was made. The chartering committee surrendered none of its authority and the parties were to be protected in their legal rights.
The chartering committee could not impose a money penalty upon either the owner or the owner’s vessel whether the owner be a foreigner or a native, and especially could this not be done when both the owner and the vessel were foreigners, and in this instance the committee did not pretend to exercise such authority. We say this advisedly, for Peterson, the charterer, had paid to the owner of the Jolanda a sum in excess of the $22 freight rate fixed by the committee, and the most that could have been exacted by the com *16 mittee of the owner upon this basis would have been $5,880, and assuredly if it had been exacted the money would have belonged to the charterer and not the United States.
We need not dwell at length upon the subject of penalties. Section 16 of the act of July 18, 1918, provided for the punishment of a violator of the same. A fine of not more than $5,000, imprisonment for not to exceed two years, or both, constituted the fixed penalties. There is not in this entire record the remotest suggestion, much less proof, that the owner of the Jolanda even contemplated a violation of the statutes; and that he consented to the depositing of the freight due him to escape criminal action, or that the committee accepted the same in lieu of proceeding under the statute as a punitive measure, is not in the slightest degree sustained.
One outstanding fact which conclusively exonerates the owner from any charge involving an intent to escape from or circumvent any provision of the act of July 18, 1918, is found in the provisions of the charter party itself, as disclosed in Finding 3. No objection has been made to this finding and the record sustains it. The owner, as well as the charterer, in making the charter party, expressly recognized the fact that if a valid law was in effect by which authorities of the United States could change the terms of the charter party, the parties to the same would comply therewith. We have heretofore quoted in this opinion the precise sections to which we now refer.
We are not concerned, as evidently the chartering committee was, over the amount of the freight fixed in the charter party. The parties to the charter party were competent to make the contract and the World War was flagrant, involving the high seas. It is difficult indeed to comprehend by what process of reasoning the balance of freight due the owner of the vessel became the property of the United States. The United States came into possession of the funds in virtue of an agreement lawfully entered into between its lawfully constituted agency to act in the premises and the parties to this case, whereby it was understood *17 and agreed that the lawful owner of the money should eventually have it.
The plaintiffs can not recover interest notwithstanding the money has been retained for a long period of years. The transaction as detailed precludes the contention that the money sued for was taken by the United States for a public use. The agreement effectually negatives such a contention. The acts of the parties were voluntary and in accord with an agreement.
The plaintiffs are entitled to a judgment for $87,917.20. It is so ordered.
Whaley, Judge; Williams, Judge\ LittletoN, Judge; and GreeN, Judge, concur.